UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        No. S2-4:15CR549 CEJ/NCC
                                     )
FRANKIE M. LEWIS,                    )
                                     )
            Defendant.               )

## MEMORANDUM, AND REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Based on the evidence and testimony adduced, as well as a review of the transcript of the hearing in this matter; and having had an opportunity to evaluate the credibility of the witnesses and to observe their behavior, the undersigned makes the following finds of fact and conclusions of law.

### Findings of Fact

On December 5, 2011, Kenneth Jamison, Special Agent with the Environmental Protection Agency's ("EPA") Criminal Investigation Division applied for a federal search warrant to search Sure Start Battery and Tire Company ("Sure Start") located at 6767 St. Charles Rock Road, St. Louis, Missouri 63133. The search warrant, application and affidavit, and return are filed as government's exhibits 1, 2 and 3. They are incorporated by reference as if fully set

out here. They are the best evidence of their contents. The summary below is merely for the trial court's convenience.

The search warrant affidavit described the qualifications of Agent Jamison—he is a 14-year veteran with the EPA—and the location to be searched with particularity, along with a photograph of Sure Start. The search warrant for Sure Start also authorized a search of "any vehicles and or buildings thereon." The affidavit described Agent Jamison's knowledge and experience regarding his investigation of criminal violations of federal environment statutes, including the Clean Air Act. Agent Jamison was familiar with the requirements imposed on automobile owners in Missouri regarding vehicle safety and emissions inspections. He was also familiar with the licensing requirements for inspectors and mechanics who conduct these inspections, including those at Sure Start. Missouri state vehicle inspections, when conducted properly, meet the criteria for compliance with the Clean Air Act and EPA oversight of federal environmental laws. The Saint Louis area's compliance program is called the Gateway Vehicle Inspection Program ("GVIP"). Agent Jamison's experience in law enforcement led him to conclude that there was probable cause to believe that violations of the Clean Air Act and other federal laws occurred at Sure Start during his investigation.

Agent Jamison attested that Sure Start obtained its license to perform vehicle safety and emissions testing in October 2007 at 6767 St. Charles Rock Road, St. Louis, Missouri. The State of Missouri sold emissions detection equipment to Sure Start through a contractor as all license holders were expected to purchase. On May 27, 2008, emissions testing and safety inspections ceased when Sure Start's license, along with two employee inspectors licenses, were revoked for one year by the Missouri Highway Patrol. The State's action occurred after regulators determined that Sure Start practiced illegal "clean scanning" which ensured that an otherwise

ineligible vehicle passed inspection on paper by bypassing the emissions inspection equipment. Clean scanning is accomplished when a substitute vehicle is connected to the equipment in place of the customer's vehicle. Thereafter, Sure Start entered false information into the inspection system that did not reflect the actual emissions output of certain customer vehicles. Agent Jamison was aware that Missouri's GVIP program was created to comply with the Clean Air Act's standards to control pollutants in the Saint Louis area. At the time the Sure Start search warrant issued, the greater Saint Louis area had a moderate non-attainment rating, which meant that air pollutants exceeded federal regulatory standards.

Agent Jamison interviewed one of the Sure Start inspectors who made statements about his involvement in manufacturing false test results at a cost to the customer that was higher (as much as $125) than the standard cost ($24) for a proper emissions test. Thereafter, in 2008 and 2009, two Sure Start inspectors pleaded guilty in federal court in this District for their involvement in the scheme. In January 2010, Sure Start and the inspector previously interviewed re-applied for their licenses and they were reinstated and authorized to conduct safety and vehicle emissions inspections. In February 2011, the Missouri Highway Patrol again revoked the business license and the inspector's license for suspicion of conducting a fraudulent safety inspection. The state imposed a 180-day suspension.

Thereafter, Agent Jamison began a new investigation of Sure Start with the assistance of the Missouri Highway Patrol and the Missouri Department of Revenue. The agencies provided alleged fictitious emission certificates and altered vehicle sales tax documents. Agent Jamison interviewed a Sure Start customer who stated that she, and other customers, paid Sure Start for vehicle registration paperwork and license plates after being told by a Sure Start employee that

the auto shop was an authorized license sub-station. The same witness observed a stack of car titles on site and a Sure Start employee using a laptop computer in the office.

At the same time, Agent Jamison investigated Saint Louis-area Missouri License Offices where irregularities were suspected. He knew that license offices are required to confirm that a vehicle has passed GVIP before the owner is issued a valid vehicle registration. The affidavit explained the process by which contractors bid for and are approved to issue Missouri driver's licenses, identification cards, and other documents for the proper registration of vehicles and drivers. He was aware that Sure Start is not a Missouri-authorized license office. Agent Jamison also knew that in 2008, during an earlier Sure Start investigation, a tipster provided information in which he/she characterized the Missouri License office at 4628 S. Kingshighway Boulevard, Saint Louis, MO 63109 ("S. Kingshighway"), in South City, as unscrupulous. Agent Jamison conducted an undercover operation with other agents that included physical surveillance at S. Kingshighway and video surveillance at Sure Start. The undercover operation included law enforcement "buys" or use of fraudulent insurance cards, emissions testing and titling paperwork on vehicles that failed emissions tests. Agents determined that individuals seen at Sure Start often traveled to S. Kingshighway with paperwork even though there were several other license offices closer to Sure Start, which sits in North Saint Louis County. As a result, Agent Jamison also knew Sure Start generated fake emissions test results and fraudulent documents with alterations made to the vehicle sales tax amount. This activity deprived Missouri of the full sales-tax revenue on these vehicles.

During these parallel investigations, agents installed a pole camera across the street from Sure Start. Agents identified two individuals in August 2011 who left Sure Start with paperwork, traveled to S. Kingshighway and later return to Sure Start. Lewis was one of those

people.  The other person was a Sure Start employee who agents encountered as part of their undercover operation.  On one such occasion, agents observed Lewis with paperwork in hand drive away from Sure Start in a white Cadillac Escalade with Missouri license plates.  Lewis drove to S. Kingshighway and later exited the license office without any visible paperwork.  He drove back to Sure Start.  Agents researched the white Cadillac's license plate number and found that it was registered to a different vehicle under Lewis's name.  Investigators saw Lewis, via the pole camera, on other occasions at Sure Start in August and September 2011, during which he was also driving the same white Cadillac Escalade.

Agent Jamison presented the application and affidavit to U.S. Magistrate Judge Terry I. Adelman, who signed the warrant on December 5, 2011.  The search warrant authorized the seizure of documents, which specifically defined the term document to include electronic data stored on any USB thumb drive.  Gov't Ex. 2, at p. 4.  Agent Jamison explained at the evidentiary hearing that he also had information from an anonymous caller who told him that the individuals who operated Sure Start stored documents on a thumb drive.  He described Lewis as a regular visitor to Sure Start who drove the white Cadillac Escalade.

Agent Jamison further testified that the search warrant was served on December 8, 2011.  A variety of law enforcement personnel assisted the EPA, including the Saint Louis County Police Department, the Missouri Highway Patrol, the Internal Revenue Service ("IRS") and the Missouri Department of Revenue.  Lewis was present.  Two investigators other than Agent Jamison approached Lewis at Sure Start during the service of the search warrant.  EPA Special Agent Eddie McGlasson was accompanied by Saint Louis County Police Officer Perez.  Officer Perez read Lewis his *Miranda* rights.  Agent McGlasson heard Officer Perez tell Lewis the following:

You have the right to remain silent.  Anything you say can and will be
used against you in a court of law.  You have the right to talk to
an attorney --- a lawyer and have him present with you while you
are being questioned.  If you cannot afford to hire a lawyer,
one will be appointed to represent you before any questioning,
if you wish.  And you can decide at any time to stop
the questioning and not answer any questions or make any statements.

Lewis affirmed that he understood his rights but he said that he did not know what was
happening.  Investigators had Lewis sit down inside Sure Start near one of the service bays of the
garage while they conducted their search, including the white Cadillac Escalade.  He was not
handcuffed.  They made further inquiries about Lewis's relationship with Sure Start.  At some
point, Lewis invoked his right to remain silent.  Investigators, however, asked Lewis additional
questions about the white Cadillac Escalade after he invoked his right to silence.[1]

Upon searching the vehicle and checking the vehicle identification number ("VIN"),
investigators determined that the white Cadillac Escalade driven by Lewis was reported stolen.
Agent Jamison was not aware that the vehicle was reported stolen prior to December 8, 2011.  It
was only after other investigators checked the VIN number that they made this determination.
Investigators found paperwork, a backpack and two sets of Missouri license plates inside the
vehicle.  Lewis was arrested for tampering with a motor vehicle by a Missouri Highway Patrol
officer who was present at Sure Start.

EPA investigator Charles Gilpin also testified[2] that he was also present on December 8,
2011 at Sure Start in his capacity as a digital forensic/computer crimes investigator.  The
government offered into evidence a copy of the search warrant return in which Item #8 of the

---

[1] The record is not clear from the evidence when Lewis was arrested in this chain of events.  Nevertheless,
the government has conceded that Lewis's answers to these questions tended to incriminate him in
violation of the rule in *Miranda v. Arizona*, 384 U.S. 43 (1966), and the government is not seeking
admission of those statements at trial.
[2]  Gilpin is no longer employed by the EPA and he testified by telephone by agreement of the parties.

seized items was a thumb drive.  Lewis's front pants pocket is listed as the location where the

thumb drive was found, and Gilpin is listed as the seizing officer for Item #8.  However, no

witnesses testified at the hearing about when the search and seizure of this thumb drive occurred

at Sure Start, nor was there testimony about whether the search occurred before or after Lewis

was arrested.  On cross examination, Gilpin could not recall whether he seized the thumb drive

directly from Lewis or whether someone else gave the thumb drive to him.  Gilpin did recall that

Lewis did not give him the thumb drive.

## Discussion

## Motion To Suppress Physical Evidence (Doc. 74)

### *The Search Warrant*

### A.      Probable Cause

Agent Jamison testified that Lewis was a frequent visitor to the shop, and Lewis does not

challenge the probable cause for the issuance of the Sure Start search warrant.[3]  Nevertheless, the

government relies on the Sure Start search warrant as the legal basis for searching the thumb

drive and the white Cadillac Escalade, and detaining Lewis on Sure Start property.  The court

will begin its analysis by examining the probable cause for the Sure Start search warrant.

The Fourth Amendment requires that a search warrant be supported by probable cause.

*United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009).  The United States

Supreme Court has defined probable cause to search as "a fair probability that the contraband or

evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238

(1983).  To be valid, search warrants must be based upon a finding by a neutral and detached

---

[3] The government's Response suggested that Lewis worked at Sure Start, and he is alleged to have made statements about frequenting Sure Start for safety and emissions testing for vehicles he purchased at auction.  (Gov't Response To Defendant's Motions To Suppress Physical Evidence and Statements, at pp. 6, 12).  At the evidentiary hearing, held on August 12, 2016, government's counsel proffered that Lewis had an informal, ongoing working relationship with Sure Start.

judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967). *See also*, Fed. R. Crim. P. 41. Stated another way:

> If an affidavit in support of a Search Warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' "probable cause to issue the warrant has been established."

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)).

The Supreme Court has determined what quantum of evidence is needed to meet this probable cause standard:

> In dealing with probable cause, … however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *See Illinois v. Gates*, 462 U.S. at 232. Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* Probable cause may be based on the totality of the circumstances present and, as a result, affidavits should not be read in a grudging, hyper-technical fashion. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965). Probable cause may be established in a variety of ways, including reliance on hearsay statements from reliable persons; hearsay statements from confidential informants corroborated by independent investigation; or on the

observations of trained law enforcement officers.  *See Gates*, 462 U.S. at 245; *Draper v. United States*, 358 U.S. 307, 313 (1959); and *McDonald v. United States*, 335 U.S. 451, 454 (1948).  While a variety of methods are commonly used to establish probable cause, the ones listed here are by no means all-inclusive.  Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.  *Gates*, 462 U.S. at 233.  Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.  *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).  Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference and the role of the reviewing court is "simply to ensure [the issuing judge] had a substantial basis" for the finding.  *Illinois v. Gates*, 462 U.S. at 236.

In this case, agents conducted an extensive undercover operation.  Investigators interviewed employees and customers who admitted their involvement in varying degrees to the GVIP fraud.  They conducted surveillance at Sure Start and S. Kingshighway and obtained supporting documents regarding the alleged fraud.  In addition, the affidavit explained how Agent Jamison had expertise in the methods used to bypass the emissions testing system, and he had knowledge of Sure Start's problematic history of compliance with state and federal pollution laws.  On these facts and with the above standards in mind, the Sure Start search warrant had more than sufficient probable cause.

### B.    The Search Warrant Had Sufficient Specificity and Particularity

To the extent that Lewis claims that the searches of his person and the white Cadillac Escalade were unconstitutional because they lacked justification or a warrant, the court finds that the Sure Start search warrant satisfied all reasonableness standards for the search and seizure of

business documents from the premises, including from Lewis, as contemplated by the search warrant. The undersigned will address below the constitutionality of the search of Lewis that led to their finding and seizing the thumb drive described as Item #8. *See United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) ("[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue....").[4]

Attachment B to the Sure Start search warrant explained the requested items to be seized as follows:

> The term "document" includes: records, correspondence, information, data, files, or other materials in whatever form including handmade, e-mail, or mechanical form (such as printed, written, handwritten or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as tapes, cassettes, hard disks, external drives, memory chips, USB thumb drives, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, ZIP cartridges, printer buffers, smart cards, or electronic notebooks, or any other storage medium)[.]

"To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *Id*. at 1079 (citing *United States v. Horn*, 187 F.3d 781, 788 (8th Cir. 1999)). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Id*. (citing *Horn*, 187 F.3d at 788). The particularity requirement under the Fourth Amendment is not a "hypertechnical" standard, but one of "practical accuracy." *Id*. (citing *United States v. Peters*, 92 F.3d 768, 769–770 (8th Cir. 1996)). *See also United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007)(recognizing that authorization to search and seize all computers, digital recording devices, and data storage devices in a residence by way of a

---

[4] The thumb drive presents two distinct search and seizure issues of constitutional significance. One issue concerns whether agents were authorized to search Lewis, which led to the seizure of the thumb drive. The second issue is whether they could lawfully search the thumb drive upon its seizure. Section B of this Memorandum, Report and Recommendation addresses the second question.

search warrant was reasonable because "it is frequently difficult, and often times more intrusive to an individual's privacy, to perform an on-site search of a computer.").

In this case, it was a reasonable calculation by Agent Jamison that computer records and data storage devices found at Sure Start would contain relevant evidence, given the nature of the most recent allegations, plus the anonymous caller's information that a thumb drive contained Sure Start documentary records. A witness and undercover agents told Agent Jamison that he/she observed numerous vehicle documents, including car titles, near an employee who used a laptop computer, although the witness did not know precisely how that employee used the laptop. Investigators knew from another witness that Sure Start provided license plates to a customer without State licensing authority to do so. Investigators observed Lewis drive the white Cadillac with license plates registered to another vehicle. They saw him travel to the S. Kingshighway license office with paperwork in a similar manner as did other customers that were directed to go there by Sure Start to circumvent the GVIP system.

Moreover, Agent Jamison had knowledge of the paper trail needed to pass Missouri's GVIP system and what would be needed to attempt to fool police officers, license bureau staff or others seeking proof of vehicle insurance and proper registration. It was reasonable for Agent Jamison with his training and experience to expect these documents to be stored and available for re-use or replication. And Lewis was not a one-time customer at Sure Start. Agent Jamison suspected his involvement in the alleged fraud. Regardless of the precise nature of his relationship with Sure Start, investigators decided that his regular presence was notable enough to include their surveillance of Lewis's back-and-forth to S. Kingshighway in the search warrant affidavit. Given the large-scale involvement of customers and documentation involved, it was reasonable for Agent Jamison to conclude that Lewis possessed documentary evidence related to

the EPA investigation, given the totality of the circumstances.  On these facts, the search of the thumb drive's stored electronic data was justified under the search warrant and it was described in a sufficiently definite way.

The search of the white Cadillac Escalade was also justified.  As an auto repair shop, there was a reasonable probability that the business would have a variety of vehicles present for repair, plus additional vehicles on property belonging to employees or visitors that came and left regularly.  The request to search "all vehicles and or buildings thereon" was reasonable and sufficiently particular.  Given the long history of similar and repeated fraud at Sure Start that involved several employees, numerous vehicles and customers, it was reasonable for the search warrant to authorize the search of all vehicles present, including the white Cadillac Escalade.

### C.       Good Faith Reliance

The government also argues that the affiant in this case had a good faith basis to rely on the search warrant.  The court finds that good faith was well founded.

*United States v. Leon*, 468 U.S. 897 (1984), provides that it is reasonable for investigators who executed the warrant to rely upon it in good faith.  In *Leon*, the Supreme Court considered whether the exclusionary rule ought to be applied in the case where the lower courts concluded that the subject search warrant was not supported by probable cause in the attached affidavit. The Supreme Court weighed the question of whether the issuing judge acted with detached and neutral scrutiny and decided if so, then the judge's probable cause ruling should be given deference.  468 U.S. at 913-14.  Here, Lewis has not shown that the issuing judge acted other than in a detached and neutral manner.  It follows from the totality of the circumstances of this case that U.S. Magistrate Judge Adelman acted in a way that was consistent with "the detached

scrutiny of a neutral magistrate." *Id.* at 913. There is no evidence before this court that indicates that the issuing judge acted as a "rubber stamp for the police." *Id.* at 914.

Next, the Supreme Court considered that deference to the issuing judge may diminish in light of the type of knowing or reckless falsity in the affidavit that was the subject of *Franks v. Delaware*, 438 U.S. 154 (1978). Defendant makes no such claim in this case. *United States v. Finley*, 612 F.3d 998, 1002-03 (8th Cir. 2010).

Further, the Supreme Court considered that applying the exclusionary rule,

> is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Leon*, 468 U.S. at 917.

Finally, the Supreme Court considered whether the form of the issued warrant was technically sufficient. *Id.* at 921. There is no evidence to the contrary. Further, the Eighth Circuit has stated

> We have recognized four circumstances that preclude a finding of good faith: "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid."

*Id.* (quoting *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011)). In evaluating a search under *Leon*, we "must look at the objectively ascertainable question of whether a reasonably well

trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). The warrant issued here met the requisite criteria. Because agents had probable cause for the search warrant and they relied in good faith on its issuance, the evidence was seized lawfully.

### *Automobile Exception To The Warrant Requirement*

Even without the Sure Start search warrant, agents could search the white Cadillac Escalade under the automobile exception to the warrant requirement. The automobile exception to the warrant requirement provides than an officer with probable cause to search a vehicle may search any item within that vehicle that is capable of containing the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else. *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999). "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). *See also United States v. Brown*, 634 F.3d 435 (8th Cir. 2010).

The Eighth Circuit has noted that the "automobile exception" permits the warrantless search of a vehicle if the police "had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003). If the automobile exception applies, the vehicle need not be searched immediately. *United States v. Castaneda*, 438 F.3d 891, 894 (8th Cir. 2006). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable-cause determination, we "apply a common sense approach and consider all relevant circumstances." *Id*.

Agents had probable cause to search the white Cadillac Escalade consistent with the Sure Start search warrant as discussed above. Additionally, investigators knew that Lewis was driving a vehicle with license plates registered to a different automobile. Given the investigation of license-plate fraud and that the vehicle was reported stolen, agents had probable cause to search the vehicle on this basis as well.

### Search Of Defendant And Seizure Of Items From Him

In his Motion To Suppress Physical Evidence, Lewis argues that he did not consent to a search and, therefore, any search of him was unlawful. At the evidentiary hearing, Lewis also argued that he was not lawfully arrested and there could be no lawful search incident to arrest. The government does not argue that it obtained consent to search Lewis or the white Cadillac Escalade, so the court will not analyze this exception to the warrant requirement because there is no dispute that this is inapplicable. Instead, the government invites the court to consider Eighth Circuit case law in which law enforcement already had probable cause to arrest but a search of that person occurred first. If factually supported, then the reverse order of events would still fall within the search-incident-to-arrest exception to the warrant requirement. Under the Fourth Amendment, "a warrantless search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement. *Missouri v. McNeely*, ⎯⎯ U.S. ⎯⎯, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). *See also United States v. Chartier*, 772 F.3d 539 (8th Cir. 2014). This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338. The government contends that the search was lawful under the reasoning in *Chartier* and, alternatively, under the inevitable discovery doctrine.

In *Chartier*, a traffic stop of a vehicle in which the defendant was a passenger led to a police canine's alert around the car. The Court ruled that the dog's alert was sufficient to establish probable cause that the defendant possessed illegal drugs that were found in his pockets before he was arrested. He was then arrested for possession of narcotics. *Id.* at 546. "Here, however, probable cause for arrest existed even before the search, and since 'the formal arrest followed quickly on the heels of the challenged search of [Chartier's] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.' *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980). Thus the search of Chartier's person did not violate his constitutional rights." *Chartier*, 772 F.3d at 546.

This case is not like *Chartier*. Here, agents knew that Lewis was driving the white Cadillac Escalade with license plates registered to a different automobile before December 8th. This is a violation of Missouri law, punishable as an infraction and subject to a fine. *See* Mo. Rev. Stat. §§ 301.130 and 301.440. While this might have been evidence of Lewis's involvement in the GVIP fraud, the government does not argue that this fact established probable cause for his arrest.[5] The government's Response contends that agents had knowledge "before the execution of the search warrant" that Lewis drove a stolen vehicle with the wrong plates and these facts together established probable cause. The evidence at the hearing does not support this finding because Agent Jamison testified that he did *not* know that the white Cadillac Escalade was stolen until after EPA agents served the search warrant when they researched the VIN number. And the government has conceded that it does not intend to rely on statements made by Lewis about the vehicle at trial, so there was no evidence of what he said or the timing of these possible admissions to establish what agents knew before they searched him. The undersigned

_____

[5] The government's Response states that the search of Lewis occurred prior to his arrest. (Doc. 78 at, p. 10).

finds that, on December 8th, the search of Lewis at Sure Start was not justified at the time it occurred.

The rule in *Michigan v. Summers*, 452 U.S. 692 (1981), does not cure the improper search. "The *Summers* rule permits officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted,'" *Bailey v. United States*, 133 S.Ct. 1031 (2013) (quoting *Summers*, 452 U.S., at 705, 101 S.Ct. 2587, even when there is no particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers, *Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299). Detention is permitted "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Id*., at 98, 125 S.Ct. 1465. Although the Supreme Court had long held that the detention of individuals present during the execution of a valid search warrant implicitly carries with it authority to detain those individuals present, such authority is not without bounds. The Eighth Circuit has noted, "[i]n contrast [to the search of a resident of a home during a search warrant], an articulable and individualized suspicion does not exist to search the patron of a public business during the execution of a search warrant." *United States v. Johnson*, 528 F.3d 575, 579 (8th Cir. 2008)(citing *Summers* and *Ybarra v. Illinois*, 444 U.S. 85, 90-91 (1979)). Regardless of whether Lewis was purely a patron or a quasi-employee, he was not the subject of the search warrant and investigators lacked the authority to search him simply because he was present.

However, the undersigned agrees that the doctrine of inevitable discovery does apply here and the thumb drive should not be suppressed. The doctrine of inevitable discovery provides, "the evidence found need not be suppressed if the two prongs of the inevitable discovery doctrine are proved by a preponderance of the evidence: (1) there is a reasonable

probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008); *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008); *see also Nix v. Williams*, 467 U.S. 431, 444-448 (1984). In *Thomas*, officers searched the pockets of the defendant beyond the scope of a *Terry* stop while they were looking for a murder suspect and questioning the defendant in an effort to confirm his identity. *Id.* at 857. They found a bus ticket in his pants pocket with his actual name and later determined that he had an outstanding warrant for his arrest. The Court reasoned that the discovery of the bus ticket was inevitable, and the "substantial, alternative line of investigation" was their questioning him about his identity to rule him out as a murder suspect. *Id.*

In the present case, as explained in detail below, there is a sufficient quantum of proof that Lewis would have been arrested for tampering with a motor vehicle, resulting in a search incident to arrest and seizure of the thumb drive. By virtue of the execution of the Sure Start search warrant, the EPA's "substantial, alternate line of investigation," was to confirm Lewis's identity, question Lewis about his role at Sure Start, and investigate why he was driving the white Cadillac Escalade with the wrong license plates.

### *Defendant's Arrest*

For the reasons stated below, the undersigned finds that agents had reasonable suspicion to detain Lewis during the execution of the search warrant and his arrest was supported by probable cause.

The rule in *Michigan v. Summers, supra*, permitted the detention of Lewis at Sure Start on December 8th. Such detentions serve a three-fold purpose that outweighs, on balance, the

countervailing interest that individuals enjoy regarding personal liberty. *See generally*, *Michigan v. Summers*, 452 U.S. 692 (1981). The *Summers* rule recognized the government's substantial interests in 1) promoting officer safety, 2) conducting a complete search and 3) preventing flight from the scene. The police's "authority to detain incident to a search" is "categorical," and not dependent "on the quantum of proof justifying detention of the extent of the intrusion to be imposed by the seizure." *Mena*, 544 U.S. 93 at 98.

There was also particularized suspicion about Lewis. Investigators knew that Lewis drove the white Cadillac Escalade with license plates registered to another vehicle. Lewis traveled to S. Kingshighway with paperwork similar to other Sure Start invitees or customers. He was not considered an unknown bystander at Sure Start on December 8th. Agent McGlasson testified that they anticipated that Lewis would be present, following the same pattern as they had observed him on many prior occasions, and they planned for Agent McGlasson to approach him. These circumstances were consistent with the markers of other fraudulent conduct at Sure Start. *See, e.g., United States v. Bullock*, 632 F.3d 1004, 1011 (ruling that police had reasonable suspicion to detain defendant while they served search warrant at the residence he visited minutes before they stopped the vehicle in which he was a passenger). Likewise here, investigators had reasonable suspicion to detain Lewis while they conducted the property search based on the totality of the circumstances that led them to secure a search warrant. *See United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (recognizing that "'[w]hen multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication.'") (quoting *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

This calls into question when did agents have probable cause to arrest Lewis. The Eighth Circuit has ruled that whether officers make a formal arrest or a detention ripens into an arrest, "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *Guevara*, 731 F.3d at 832; *quoting Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)); *see also Martinez*, 462 F.3d at 907, 910 (holding in the alternative that even if handcuffing a suspect did convert the detention into an arrest, the arrest was justified by probable cause). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich*, 715 F.3d at 1059 (quoting *Borgman*, 646 F.3d at 523). The courts look at whether an officer objectively had probable cause for the arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

"Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010). In making this determination, "[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation marks and citation omitted). "Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (citation omitted); *see also United States v. Jones*, 535 F.3d

886, 890 (8th Cir. 2008). The criminal activity can be for an offense involving a felony, misdemeanor or infraction. *See United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010).

Prior to investigators' arrival at Sure Start, Agent Jamison knew that Lewis was driving the white Cadillac Escalade with license plates registered to another vehicle. They saw him regularly. At Sure Start, they determined that the vehicle was reported stolen and investigators could draw inferences under the totality of the circumstances that Lewis had committed the state crime of tampering with a motor vehicle. *Perdoma*, 621 F.3d 745 at 749. The arrest was valid.

### **Motion to Suppress Statements (Doc. #75)**

Lewis asks this court to suppress his statements on three grounds. He argues that his arrest was unlawful; that his *Miranda* rights were violated and, finally, that his statements were not voluntary. The court has already determined that Lewis's arrest was lawful, and the government has conceded that it will not seek to admit statements made by Lewis after he invoked his right to counsel. The remaining argument regarding the voluntary nature of Lewis's statements should be denied for the following reasons.

When a defendant is both in custody and interrogated, he must be advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Officers must provide Miranda warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.' "*United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (internal quotation marks omitted)). See *United States v. Crisolis–Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)).

The question of whether a defendant's will is overborne or statements lacked the requisite voluntariness does not depend on *Miranda* warnings being given. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (citation and internal quotation marks omitted). The court "consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (alteration in original) (citation and internal quotation marks omitted). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412 (1986). *United States v. Castro–Higuero*, 473 F.3d 880, 886 (8th Cir. 2007) (internal quotation omitted).

Relevant to this inquiry is whether an accused has knowingly and voluntarily waived Miranda rights – an inquiry which depends upon the facts of each particular case, including the defendant's background, experience, and conduct. *United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999). "The government has the burden of proving that the defendant 'voluntarily and knowingly' waived his rights." *Id.* This burden is a heavy one. *Lamp v. Farrier*, 763 F.2d 994, 996 (8th Cir. 1985) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in

at least some cases waiver can be clearly inferred from the actions of the person interrogated."
*Butler*, 441 U.S. at 373.

The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)). In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. *Haynes v. Washington*, 373 U.S. 503 (1963); *Colorado v. Connelly*, 479 U.S. at 170. However, as the Supreme Court stated in *Berkemer v. McCarthy*, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." *Id.* at 433 n.20; *Dickerson*, 530 U.S. at 444.

Officer Perez read *Miranda* warnings to Lewis when they first approached him, even though it is not clear whether Lewis was yet under arrest or just detained. Lewis affirmed that he understood his rights and expressed that he did not know what was happening in response to the search warrant team. He was not handcuffed, nor was he put in a patrol car. He either remained standing where investigators found him or he was told to take a seat near the service bays in the garage. Agent McGlasson left him at some point to search the white Cadillac Escalade and Agent Jamison was occupied talking to an employee of Sure Start and searching the office. There was no evidence at the hearing about the number of law enforcement personnel present on December 8th at Sure Start—and there may have been many officers present—but there is no

evidence of the types of police conduct that courts have considered would illustrate a coercive environment. *See United States v. Drayton*, 536 U.S. 194, 204 (2002), where the Court concluded an encounter was not coercive because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Lewis agreed to make a statement and he decided later to invoke his right to silence. Because the pre-invocation statements were not the result of any threats, promises or coercion by the officers, his statements were voluntary. *Colorado v. Connelly*, 479 U.S. at 170.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion To Suppress Physical Evidence (Doc. #74) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that defendant's Motion To Suppress Statements (Doc. # 75) be **GRANTED** as to the suppression of all statements made after he invoked his right to counsel and should be **DENIED** in all other respects.

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in the waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).


/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of September, 2016.